UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------ x

SONY/ATV SONGS LLC, SONY/ATV SOUNDS
LLC, SONY/ATV TUNES LLC, PEER
INTERNATIONAL CORPORATION, SONGS OF
PEER, LTD., PEERMUSIC III, LTD., MPL MUSIC
PUBLISHING, INC., FRANK MUSIC
CORPORATION, RYTVOC, INC., on behalf of
themselves and all others similarly situated,

Plaintiffs,

-against-

MUSICNET, INC. d/b/a MEDIANET DIGITAL,

Defendant.

------------------------------------------------------------------ x

08 Civ. 01487 (JSR)


**ANSWER OF DEFENDANT
MUSICNET, INC.**


**JURY TRIAL DEMANDED**


**Filed Electronically**


Defendant MusicNet, Inc. d/b/a MediaNet Digital ("MediaNet"), by and through

its undersigned counsel, hereby responds to the Complaint of Sony/ATV Songs LLC, et al.

("Plaintiffs") as follows:

      1.     MediaNet denies the allegations in Paragraph 1 of the Complaint.

      2.     MediaNet admits the allegations in Paragraph 2 of the Complaint with

respect to certain types of services offered by MediaNet and the identity of certain distributors of

MediaNet, but denies the allegations in Paragraph 2 insofar as it alleges that MediaNet's

activities are unlawful.

      3.     MediaNet admits that it delivers digital copies of sound recordings (and

whatever musical works are embedded therein) to end users in the form of limited or conditional

downloads (hereinafter "conditional downloads"), but denies the remaining allegations in

Paragraph 3 of the Complaint.

4.    MediaNet admits that, as part of the process of delivering music to consumers, copies of sound recordings (and of the musical works embedded therein) are made on MediaNet's servers, but denies the remaining allegations of Paragraph 4 of the Complaint.

5.    MediaNet denies the allegations in Paragraph 5 of the Complaint, except that it admits that is owned by Baker Communications Fund II, L.P. (hereinafter "Baker") (as more fully set forth in MediaNet's Rule 7.1 disclosure statement).

6.    MediaNet denies the allegations in Paragraph 6 of the Complaint as to MediaNet, and lacks knowledge and information sufficient to form a belief as to the truth of the allegations concerning what the plaintiffs seek.

7.    MediaNet avers that Paragraph 7 of the Complaint states legal conclusions as to which no responsive pleading is required.

8.    MediaNet avers that Paragraph 8 of the Complaint states legal conclusions as to which no responsive pleading is required.

9.    MediaNet avers that Paragraph 9 of the Complaint states legal conclusions as to which no responsive pleading is required, but admits that it does business in New York State and in this district.

10.    MediaNet avers that Paragraph 10 of the Complaint states legal conclusions as to which no responsive pleading is required, but admits that it does business in New York State and in this district.

11.    MediaNet lacks knowledge and information sufficient to form a belief as to the truth of the allegations in Paragraph 11 of the Complaint, and further avers that Paragraph 11 states legal conclusions as to which no responsive pleading is required.

12.     MediaNet lacks knowledge and information sufficient to form a belief as to the truth of the allegations in Paragraph 12 of the Complaint.

13.     MediaNet lacks knowledge and information sufficient to form a belief as to the truth of the allegations in Paragraph 13 of the Complaint.

14.     MediaNet lacks knowledge and information sufficient to form a belief as to the truth of the allegations in Paragraph 14 of the Complaint.

15.     MediaNet lacks knowledge and information sufficient to form a belief as to the truth of the allegations in Paragraph 15 of the Complaint.

16.     MediaNet denies the allegations in Paragraph 16 of the Complaint.

17.     MediaNet admits the allegations in Paragraph 17 of the Complaint and refers to its rule 7.1 disclosure statement filed with the Court, which explains its ownership structure in greater detail.

18.     MediaNet avers that Paragraph 18 of the Complaint states legal conclusions as to which no responsive pleading is required.

19.     MediaNet avers that Paragraph 19 of the Complaint states legal conclusions as to which no responsive pleading is required.

20.     MediaNet lacks knowledge and information sufficient to form a belief as to the truth of the allegations in Paragraph 20 of the Complaint, and further avers that Paragraph 20 states legal conclusions as to which no responsive pleading is required.

21.     MediaNet admits that it was founded in 1999, that it was jointly owned by RealNetworks and several record companies for some period of time, that it began offering a service in late 2001, and that it was purchased by Baker in 2005.

3

22.    MediaNet admits the substantive factual allegations in Paragraph 22 of the Complaint, but denies that its distributors are "business partners" in a legal sense or that MediaNet was "boasting" in the manner alleged.

23.    MediaNet admits the substantive factual allegations in Paragraph 23 of the Complaint, but denies that its distributors are "business partners" in a legal sense, and lacks knowledge and information sufficient to form a belief as to what the plaintiffs mean when they allege that MediaNet "serves millions of streams and downloads each day."

24.    MediaNet avers that Paragraph 24 of the Complaint states legal conclusions as to which no responsive pleading is required, and otherwise reiterates its response set forth in Paragraph 4 hereof.

25.    MediaNet admits that since 2001 it has been entitled to obtain and has obtained licenses from the Harry Fox Agency (HFA) for the use of musical works in its service. MusicNet further admits that the Recording Industry Association of American (RIAA), National Music Publishers Association (NMPA) and HFA entered into an agreement in October 2001 (the "2001 Agreement") pursuant to which MediaNet became entitled to secure licenses from HFA, and respectfully refers the Court to the terms and conditions of the 2001 Agreement in lieu of plaintiffs' characterization thereof. MediaNet denies the remaining allegations of Paragraph 25 of the Complaint.

26.    MediaNet admits that the plaintiffs purport to characterize the 2001 Agreement, and respectfully refers the Court to the terms and conditions of the 2001 Agreement in lieu of plaintiffs' characterization thereof.

27.    MediaNet denies the allegations in Paragraph 27 of the Complaint, but admits that it was notified by HFA in May of 2005 (and on later occasions) that HFA had taken

the position that, after MediaNet's purchase by Baker, MediaNet was no longer entitled to rely on the 2001 Agreement. MediaNet avers that it informed HFA that, in fact, it was legally entitled to rely on the 2001 Agreement to secure licensing from HFA, and admits that, without waiving its rights under the 2001 Agreement, MediaNet negotiated the terms of a new agreement with HFA which was agreed upon in all materials respects but was never executed. MediaNet specifically denies that it was no longer covered by the 2001 Agreement.

      28.     MediaNet denies the allegations in Paragraph 28 of the Complaint except that it admits that its website states (accurately) that it has procured necessary licensing rights for its service and that it reports and pays rights holders and that it has entered into license agreements directly with certain rights owners.

      29.     MediaNet denies the allegations in Paragraph 29 of the Complaint.

      30.     MediaNet lacks knowledge and information sufficient to form a belief as to the truth of the allegations in Paragraph 30 of the Complaint.

      31.     MediaNet denies the allegations in Paragraph 31 of the Complaint.

      32.     MediaNet lacks knowledge and information sufficient to form a belief as to the truth of the allegations in Paragraph 32 of the Complaint.

      33.     MediaNet denies the allegations in Paragraph 33 of the Complaint.

      34.     MediaNet lacks knowledge and information sufficient to form a belief as to the truth of the allegations in Paragraph 34 of the Complaint.

      35.     MediaNet denies the allegations in Paragraph 35 of the Complaint, and further avers that Paragraph 35 states legal conclusions as to which no responsive pleading is required.

      36.     MediaNet denies the allegations in Paragraph 36 of the Complaint.

37.    MediaNet denies the allegations in Paragraph 37 of the Complaint.

38.    MediaNet refers to and incorporates by reference its responses to Paragraphs 1-37 of the Complaint.

39.    MediaNet denies the allegations in Paragraph 39 of the Complaint.

40.    MediaNet denies the allegations in Paragraph 40 of the Complaint, and further avers that Paragraph 40 states legal conclusions as to which no responsive pleading is required.

41.    MediaNet denies the allegations in Paragraph 41 of the Complaint.

42.    MediaNet denies the allegations in Paragraph 42 of the Complaint.

43.    MediaNet denies the allegations in Paragraph 43 of the Complaint, and further avers that Paragraph 43 states legal conclusions as to which no responsive pleading is required.

44.    MediaNet denies the allegations in Paragraph 44 of the Complaint.

45.    MediaNet denies the allegations in Paragraph 45 of the Complaint.

46.    MediaNet refers to and incorporates by reference its responses to Paragraphs 1-45 of the Complaint.

47.    MediaNet denies the allegations in Paragraph 47 of the Complaint.

48.    MediaNet denies the allegations in Paragraph 48 of the Complaint, and further avers that Paragraph 48 states legal conclusions as to which no responsive pleading is required.

49.    MediaNet denies the allegations in Paragraph 49 of the Complaint.

50.    MediaNet denies the allegations in Paragraph 50 of the Complaint.

51.    MediaNet denies the allegations in Paragraph 51 of the Complaint, and further avers that Paragraph 51 states legal conclusions as to which no responsive pleading is required.

52.    MediaNet denies the allegations in Paragraph 52 of the Complaint.

53.    MediaNet denies the allegations in Paragraph 53 of the Complaint.

54.    MediaNet refers to and incorporates by reference its responses to Paragraphs 1-53 of the Complaint.

55.    MediaNet denies the allegations in Paragraph 55 of the Complaint, except insofar as MediaNet admits that it controls its activities in delivering musical tracks and songs as part of the service it operates.

56.    MediaNet denies the allegations in Paragraph 56 of the Complaint, and further avers that Paragraph 56 states legal conclusions as to which no responsive pleading is required.

57.    MediaNet denies the allegations in Paragraph 57 of the Complaint.

58.    MediaNet denies the allegations in Paragraph 58 of the Complaint.

59.    MediaNet denies the allegations in Paragraph 59 of the Complaint, and further avers that Paragraph 59 states legal conclusions as to which no responsive pleading is required.

60.    MediaNet denies the allegations in Paragraph 60 of the Complaint.

61.    MediaNet denies the allegations in Paragraph 61 of the Complaint.

62.    MediaNet refers to and incorporates by reference its responses to Paragraphs 1-61 of the Complaint.

63.    MediaNet denies the allegations in Paragraph 63 of the Complaint.

64.    MediaNet denies the allegations in Paragraph 64 of the Complaint, and further avers that Paragraph 64 states legal conclusions as to which no responsive pleading is required.

65.    MediaNet denies the allegations in Paragraph 65 of the Complaint.

66.    MediaNet denies the allegations in Paragraph 66 of the Complaint.

67.    MediaNet denies the allegations in Paragraph 67 of the Complaint, and further avers that Paragraph 67 states legal conclusions as to which no responsive pleading is required.

68.    MediaNet denies the allegations in Paragraph 68 of the Complaint.

69.    MediaNet denies the allegations in Paragraph 69 of the Complaint.

70.    MediaNet refers to and incorporates by reference its responses to Paragraphs 1-69 of the Complaint.

71.    MediaNet denies the allegations in Paragraph 71 of the Complaint.

## AFFIRMATIVE DEFENSES

### Facts Common to MediaNet's  Affirmative Defenses

72.    Since its incorporation in 1999 and the launch of its service in late 2001, MediaNet has taken steps to secure all necessary publishing and sound recording copyright licenses and paid copyright owners according to the terms of those licenses.  It has always sought to operate, and has operated, as a model "copyright citizen."  The picture of MediaNet painted by plaintiffs in their complaint – as a "pirate" service disregarding copyright holders – is completely contradicted by MediaNet's long licensing history and its background as a venture founded by record companies.

73.    MediaNet has obtained licenses for the reproduction of musical works distributed via its service in large part pursuant to the 2001 Agreement. The 2001 Agreement contains no "change of control" or other provision by which its coverage of the MediaNet service would terminate upon a subsequent sale of MediaNet.

74.    Further, the 2001 Agreement contains express "Term" and "termination" provisions from which it is clear that HFA/NMPA did not have the right to terminate coverage of MediaNet as it purported to do in May 2005. Specifically, Section 7 provides that the 2001 Agreement remains in effect from its "Effective Date" (October 5, 2001) until "the final non-appealable determination of royalty rates for each of On-Demand Streams and Limited Downloads through negotiation and/or a CARP proceeding." As of yet, there has been no such "determination of royalty rates" of the nature referred to in Section 7 of the 2001 Agreement. However, as discussed below, there currently are ongoing proceedings before the Copyright Royalty Board (CRB) (the rate-setting body that has replaced the Copyright Arbitration Royalty Panel, or "CARP," mentioned in Section 7) precisely to determine such royalty rates.

75.    Section 7 of the 2001 Agreement identifies and is made subject to two other sections of the 2001 Agreement – Sections 4.2 and 8.5 – that can, in certain circumstances, provide for early termination or otherwise affect the Term of the 2001 Agreement prior to a CRB rate determination. Section 4.2 provides a termination right under certain conditions, but only to the RIAA (*i.e.*, not the NMPA or HFA). Section 8.5 describes what happens if either new legislation or a final, non-appealable decision by a court or the Copyright Office contradicts the stated "legal framework for [the 2001] Agreement" as set forth in Section 8.1. Because neither such contingency has occurred, Sections 4.2 and 8.5 provide no basis for termination of MediaNet's coverage under the 2001 Agreement, which remains in effect.

76.    HFA/NMPA's conduct in licensing other music distribution services pursuant to a template license based on the 2001 Agreement, even though such services were not (and are not) majority or even fractionally owned by RIAA or its record label members, is further demonstrative of the unsupported nature of HFA/NMPA's position that MediaNet became ineligible for licensing under the 2001 Agreement merely by virtue of its change in ownership. The same license terms set forth in the 2001 Agreement were offered to companies not owned by RIAA or its member record companies. including listen.com, MusicMatch, MusicNow, RealNetworks/Rhapsody, and Napster LLC. Some of these companies continue to operate under the same terms, despite having never had record-label ownership.

77.    Notwithstanding the foregoing, HFA notified MediaNet in May 2005, shortly after the Baker acquisition of MediaNet, that its position was that MediaNet, by virtue of its sale to Baker, was no longer entitled to rely on the 2001 Agreement. MediaNet promptly advised HFA of its contrary position that it <u>was</u> legally entitled to rely on the 2001 Agreement to secure licensing from HFA (including, *inter alia*, for the reasons outlined above).

78.    MediaNet nevertheless wished to avoid any ongoing business or legal dispute with HFA/NMPA. Accordingly, without waiving any of its legal positions or defenses, MediaNet ultimately negotiated the terms of a new license agreement with HFA (the "Subsequently Negotiated License") substantially similar in its terms and conditions to the 2001 Agreement (with an increased advance payment to be applied against whatever royalty rates ultimately would be established, per the 2001 Agreement, via either negotiation or CRB determination). This License was agreed upon in all material respects by both MediaNet and HFA.

79.    In December 2006, HFA – without any legitimate explanation – refused to sign the Subsequently Negotiated License.  Even after this unexpected event, however, ongoing discussions between MediaNet and HFA continued for over a year (until the filing of the instant lawsuit), during which time the parties' mutual expectation, manifested by representatives of both parties, was that MediaNet was and/or would be licensed retroactive to the launch date of its service.  Indeed, MediaNet has been actively participating throughout much of this time period (and continues to do so today) in the ongoing CRB proceedings – the agreed upon vehicle for determining publisher royalties under the 2001 Agreement – which will set the plaintiffs' royalties for the very activity underlying the claims they have asserted herein.

80.    HFA/NMPA's conduct, first in taking the unsupported position that MediaNet had become "unlicensed" under the 2001 Agreement by virtue of its sale to Baker, then in refusing to sign the Subsequently Negotiated License, and thereafter in continuing a sporadic dialogue with MediaNet until the filing of this lawsuit, is explicable only by reference to the surrounding circumstances described below, which reflect a protracted and bitter dispute between the music publishing industry, the record labels, and digital music services over the substance and value of certain rights implicated by digital music-delivery services.

81.    To start, MediaNet provides two primary, but technologically distinct, product offerings (other than the sale of permanent music track downloads not at issue herein): (i) real-time streams of "on-demand" or "interactive" music tracks played at the request of consumers, which require the consumer to be connected to the Internet and which are delivered to consumers without a copy of the streamed sound recordings being made on the consumers' receiving device; and (ii) conditional downloads of music tracks, which involve the delivery to consumers' computers or other receiving devices of full copies of sound recordings (and the

11

musical compositions embedded therein), which the consumer can then listen to repeatedly, not unlike how users consume permanent downloads. These downloads are "conditional" in that the music files become inaccessible to consumers if certain conditions are not met (e.g., if a consumer fails to pay his/her monthly subscription fee).

82.    MediaNet has licenses from each of the performance rights organizations, ASCAP, BMI, and SESAC (the "PROs"), to cover the public performance rights associated with MediaNet's on-demand streaming activities. It is not disputed among digital music services and music publishers that such streaming of music (called "interactive streaming" under the 2001 Agreement) is a public performance which must be licensed to avoid copyright infringement.

83.    It is also undisputed that the distribution of conditional (and permanent) downloads via the MediaNet service (and other digital music services) triggers a mechanical license obligation on the part of such services. HFA is the largest licensing agent of music publishers for mechanical licenses. (HFA does not act on behalf of music publishers in respect of their separate public performance right, which is licensed by the PROs.) Under the 2001 Agreement, the establishment of the actual royalty rate for mechanical reproductions of musical compositions by services like MediaNet was left to be determined, either by future negotiation between interested parties or through a copyright rate-setting tribunal (the CARP/CRB).

84.    A fundamental matter of dispute between digital music services and publishers is whether any mechanical license fee obligation is implicated by the delivery of on-demand or other "interactive" streams. Generally speaking, digital music services are of the view that streaming activity—whether "interactive" or not—does not involve the delivery to consumers of copies of music tracks; hence there should be no mechanical license fee obligation associated with such activity. The music publishers' stated position is to the contrary.

85.    Music publishers and digital music services also have disputed the converse legal issue, *i.e.*, whether the delivery of conditional downloads implicates the public performance right in the publishers' musical compositions. In a decision in April 2007, this Court (Conner, J.) ruled in the services' favor that there is no licensable public performance involved in the delivery by digital music services of a download (whether conditional or permanent). *See United States v. American Society of Composers, Authors and Publishers*, 485 F. Supp. 2d 438 (S.D.N.Y. 2007). Accordingly, MediaNet pays the PROs a royalty calculated only on its revenues associated with streaming activities, and <u>not</u> based on its revenues associated with conditional or permanent download plays or sales (based on the count of the number of "plays" of music tracks made by consumers from on-demand streams as distinct from plays made from conditional downloads).

86.    As these issues were unfolding in the incipient period of development of services providing on-demand streaming and conditional downloads, and at the insistence of HFA/NMPA, the signatories to the 2001 Agreement agreed that "interactive streams" trigger a mechanical license obligation, but left entirely open what—if any—fee reasonably should be ascribed to such activity. The 2001 Agreement went so far as to include, at the demand of HFA/NMPA, a "silencer" clause (in Section 8.2) which prohibits RIAA, its affiliates, and any entities securing licensing under the 2001 Agreement from taking any legal position in judicial or other proceedings "contrary to or inconsistent with" the music publishers' legal position that an interactive/on-demand stream triggers a mechanical licensing obligation.

87.    Between the execution of the 2001 Agreement and December 2006, there were periodic negotiations between and/or among the music publishers, RIAA, and digital music services (the latter via its trade association, the Digital Media Association, or "DiMA") regarding

the establishment of actual rates and terms for mechanical licenses associated with the activities of digital music services (inclusive of MediaNet) – rates that had been left open by the 2001 Agreement. When those negotiations failed to result in an agreement, the various parties, consistent with the royalty rate-setting vehicle set forth in the 2001 Agreement, filed "direct cases" with the CRB in December 2006 in support of their preferred rate proposals.

88.    In its December 2006 filings, DiMA, on behalf of its members (including MediaNet, which has been participating directly as a witness in the proceedings), proposed a mechanical royalty fee only for conditional and permanent downloads, but not for interactive/on-demand streaming – among other reasons because streaming, while constituting a licensable public performance, does not result in the delivery of reproductions of music tracks to consumers.

89.    HFA/NMPA reacted publicly and antagonistically to DiMA's filing, asserting that DiMA's position with respect to "interactive" streams violated the commitment made by the many entities that signed the 2001 Agreement not to take any position "contrary to or inconsistent with" the position that interactive streams do implicate mechanical rights obligations on the services' part. (*See, e.g.,* "Fox to Pull the Plug on Streams?," *HITS Daily Double,* December 12, 2006, *at* http://www.hitsdailydouble.com/news/newsPage.cgi?news06451 m01.)

90.    The facts reflect that, at various times throughout the broader negotiations between and/or among the music publishers, RIAA, and DiMA spanning 2004 until the present, MediaNet became the political pawn in HFA/NMPA's battle with DiMA and RIAA. First, during an initial period of months in 2005 and 2006, after notifying MediaNet of the HFA/NMPA position that MediaNet no longer "qualified" under the 2001 Agreement,

HFA/NMPA sought to use MediaNet as a vehicle to negotiate a specific mechanical royalty (rather than deferring to the CARP/CRB rate-setting process). That process of negotiation occupied several months before which it was dropped in favor of an agreement (the Subsequently Negotiated License identified above) between MediaNet and HFA/NMPA that was finalized as to all material terms in the fall of 2006, and which provided, instead, for a new (and heightened) advance payment by MediaNet to HFA, with the determination of the final mechanical royalty once again deferred to the CRB or subsequent negotiations.

91.    At no time during these negotiations was it suggested by HFA/NMPA that MediaNet was, by continuing to operate pending final execution of a new license agreement, infringing the copyrights of HFA-affiliated publishers or risking an infringement suit. Nor did HFA/NMPA demand that MediaNet – which serves millions of consumers though distributors like MTV and Microsoft – shut down operations until a new agreement was signed. (Indeed such a shut down would have been dramatically at odds with the desires of publishers, who are desperate to prevent paying customers from fleeing to pirate services.) To the contrary, although the parties expressed different views about whether MediaNet was still covered by the 2001 Agreement, the clear understanding of the parties, both express and implied, was that in all events any new license agreement, once signed, would apply retroactively to cover MediaNet's ongoing operation during the negotiation period, of which plaintiffs were well aware and in which they expressly acquiesced. MediaNet relied on these representations in continuing to operate.

92.    MediaNet in fact delivered the final version of the Subsequently Negotiated License to HFA for signature in early December 2006. At the same time, MediaNet

wrote to representatives of the publishers urging them to continue to license through HFA, and referring specifically to the Subsequently Negotiated License.

93.    HFA, however, did an about-face and refused to sign the Subsequently Negotiated License, citing no legitimate reason. The press indicated that it was the publishers' anger over DiMA's having filed papers in the CRB in early December, 2006 (described above) without a proposed royalty for interactive streams that motivated HFA's refusal to sign. MediaNet, upon information and belief, believes that such press reports accurately reported the publishers' bad faith "reason" for refusing to sign the Subsequently Negotiated License.

94.    Subsequent to December 2006 and until the filing of this action, MediaNet frequently urged HFA to execute the Subsequently Negotiated License (or some other document consistent with the material terms and conditions thereof). HFA/NMPA representatives consistently reported that it was only the broader political environment described above that was preventing them from doing so, and that they hoped this environment would evolve such that they would be permitted to proceed. At no time during such dialogue did HFA/NMPA indicate that the financial or other terms of the Subsequently Negotiated License were unsatisfactory.

95.    The "political" environment, however, worsened in early 2008. DiMA, in January 2008, filed a motion before the CRB asking that the CRB certify to the Copyright Office the issue of whether, as a legal matter, there is any licensable reproduction in the delivery of an interactive stream (a move that went one step further than DiMA's previous position of simply refraining from proposing a royalty rate for such reproductions, to the extent they exist). The CRB denied the motion to refer this legal issue to the Copyright Office on February 4, 2008.

96.    MediaNet believes, and has been so informed by music publisher representatives, that this lawsuit – which now accuses MediaNet of having been a pirate infringer

16

since May of 2005 – has been filed in part as retribution for DiMA's having filed the aforesaid motion. It appears that DiMA's filing has been construed by some publishers to violate the above-cited "silencer" provisions of Section 8.2 of the 2001 Agreement – ironically, the very agreement Plaintiffs now claim has not applied to MediaNet since 2005. Having negotiated with HFA in good faith since 2005, having reached an agreement acceptable to all parties, and having been led to believe that its continued operation during that period was acceptable and would be licensed retroactively by that very agreement, MediaNet now stands accused of massive infringement because HFA would not, for political reasons, actually sign the agreement.

**First Defense (License/Authorization)**

97.     Plaintiffs' claims are barred because MediaNet was at all times licensed, expressly or impliedly, or otherwise authorized to reproduce plaintiffs' works at the time of the alleged infringements.

**Second Defense (Estoppel)**

98.     To the extent MediaNet was not in fact licensed or otherwise authorized to make whatever reproductions of Plaintiffs' works were required by law to be licensed, Plaintiffs' claims are barred, in whole or in part, by the doctrine of Estoppel. MediaNet engaged in active negotiations with HFA/NMPA during which it was represented and/or implied that MediaNet could continue to operate without fear of infringement liability, and that the Subsequently Negotiated License (or any other document embodying its material terms and conditions) was near completion and would apply retroactively. All the while, Plaintiffs' acquiesced in MediaNet's continued operation up through and including the filing of this lawsuit. MediaNet reasonably relied on these representations and conduct in continuing to operate its service, and would be unfairly harmed if plaintiffs are permitted to press their claims.

17

**Third Defense (Laches)**

99.    To the extent MediaNet was not in fact licensed or otherwise authorized to make whatever reproductions of Plaintiffs' works were required by law to be licensed, Plaintiffs' claims are also barred by the doctrine of laches.  Plaintiffs, by their own admission in their complaint, informed defendants in May 2005 of their position that MediaNet had become unlicensed by virtue of its acquisition by Baker.  After MediaNet communicated to NMPA and HFA its position to the contrary, and without waiver of its position that MediaNet remained covered by the 2001 Agreement, MediaNet and HFA/NMPA embarked on a course of negotiation and dialog concerning a new agreement (the Subsequently Negotiated License) – the terms of which were agreed upon in all material respects – only to have HFA/NMPA refuse to execute said agreement.

100.    Most importantly, Plaintiffs did not press their claims in May 2005, but have waited almost three years to sue – while MediaNet actively has participated in the CRB Proceedings which will determine the very royalty amounts that MediaNet will owe plaintiffs for the reproductions at issue herein, consistent with the mechanism set forth in the 2001 Agreement for the determination of such royalty rates.  Further, rather than suing MediaNet for copyright infringement as soon as such alleged infringement became evident, Plaintiffs entered into extended negotiations with MediaNet, implying all the while that MediaNet could continue to operate without fear of infringement liability, with the understanding that any agreement would apply retroactively.  MediaNet relied on plaintiffs' conduct and inaction and continued to operate its business, including by entering into agreements with new distribution partners (to whom it warranted that it was fully licensed) during the period between May 2005 and the present.

**Fourth Defense (Copyright Misuse)**

101.    Plaintiffs' claims are barred by the doctrine of copyright misuse. Plaintiffs are using an infringement suit – a suit it implied during its negotiations with MediaNet it would not bring – to punish MediaNet for taking the position (through its trade association, DiMA) that on-demand streams do not require a license for the mechanical reproduction and distribution of a musical work. Ironically, the promise not to take such a position was made in the very agreement (the 2001 Agreement) that Plaintiffs claim has expired with respect to MusicNet.

102.    Moreover, HFA/NMPA (and the publishers on whose behalf this action purportedly has been brought) are improperly attempting to expand their legitimate copyright interest associated with the distribution of downloads (whether conditional or permanent) by improperly seeking to compel MediaNet also to secure and pay for a mechanical reproduction license applicable to "interactive" streams – notwithstanding that MediaNet already secures necessary performance licenses for such activity through the PROs.

**Fifth Defense (Unclean Hands)**

103.    Plaintiffs conduct as described above also constitutes unclean hands and prevents them from recovery.

**DEMAND FOR JURY TRIAL**

MediaNet respectfully demands trial by jury pursuant to Rule 38 of the Federal Rules of Civil Procedure on any and all issues so triable.

**PRAYER FOR RELIEF**

WHEREFORE, Defendant MediaNet prays as follows:

1.    That Plaintiffs take nothing by their Complaint and for a judgment in favor of MediaNet and against Plaintiffs, dismissing the Complaint;

2.      That MediaNet be awarded its costs of suit, including reasonable

attorney's fees pursuant to 17 U.S.C. § 505 or other applicable law; and

3.      That MediaNet be granted such other and further relief, in law or in

equity, as this Court may find just and proper.


Dated:   New York, New York
         April 7, 2008

                                  By:/s/ Kenneth L. Steinthal
                                     Kenneth L. Steinthal (KS-7897)
                                     Todd D. Larson (TL-1125)
                                     WEIL, GOTSHAL & MANGES LLP
                                     767 Fifth Avenue
                                     New York, New York 10153-0119
                                     (212) 310-8000
                                     kenneth.steinthal@weil.com
                                     todd.larson@weil.com

                                     *Attorneys for Defendant MusicNet, Inc.*